## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jan 22 2021, 8:43 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Sean C. Mullins
Appellate Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Malcolm Levell Adams,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

January 22, 2021

Court of Appeals Case No.
20A-CR-814

Appeal from the
Lake Superior Court

The Honorable
Samuel L. Cappas, Judge

Trial Court Cause No.
45G04-1608-F5-75

**Vaidik, Judge.**

# Case Summary

Malcolm Levell Adams appeals his involuntary-manslaughter conviction, arguing the trial court erred in allowing the State to amend the charging information right before trial started and the evidence is insufficient to support his conviction because the jury acquitted him of strangulation, the predicate offense for involuntary manslaughter. We affirm.

# Facts and Procedural History

In 2016, Adams and his friends James Robinson, Alfred McGhee, Reuben Espinoza, Reginald Wells, and James Boykin, Jr., played cards for money several times a week. It was not uncommon for a player to owe another player money or to be in debt and play anyway, and the friends inevitably paid one another back.

But June 14 was different. On this date, the group played cards at Espinoza's house in Gary. At some point during the evening, Boykin borrowed $5 from Adams. When Adams later asked for his $5, Boykin said he would repay him when he won more money. Adams, however, was in no mood to wait. When Boykin repeated he would repay Adams later, Adams "copped an attitude" with Boykin and threatened to reach across the table and take $5 from his pile of money. Tr. Vol. III p. 16. Boykin responded Adams could try if he wanted. Adams, who was acting "aggressive," stood up, reached across the table, and took money from Boykin's pile. Tr. Vol. II p. 201. Upset, Boykin stood up and

walked around the table to Adams. After Adams threw a punch, Adams and Boykin started "swinging at each other." Tr. Vol. III p. 21. Adams then grabbed Boykin "around" the "neck" and put him in a "chokehold" or "headlock." *Id.* at 21, 31, 50, 62; Tr. Vol. II p. 205. Adams wrestled Boykin to the ground, with Boykin lying "[f]lat on his back" and Adams on top of him "in a dominant position." Tr. Vol. II p. 206; Tr. Vol. III p. 22. While on top of Boykin, Adams continued throwing punches at him. The other men pulled Adams off Boykin and ordered Adams, who by this point was "raged," to leave. Tr. Vol. II p. 209. As soon as Adams left, the men turned their attention to Boykin, who was still lying on his back with his eyes closed. He was having "a hard time breathing" and "making a snoring sound as if he were sleeping." *Id.* at 210; Tr. Vol. III p. 77. When Boykin did not respond to commands and wet himself, they called 911. About twenty minutes later, EMS still had not arrived, so they called 911 again. By this point, Boykin was no longer making any sounds. EMS transported Boykin to the hospital, where he was pronounced dead.

[4]     Forensic pathologist Dr. Zhuo Wang conducted an autopsy. According to Dr. Wang, Boykin's cause of death was blunt-force trauma to the head complicated by asphyxia due to neck injury. Ex. 15, p. 18; Tr. Vol. III p. 167. Dr. Wang identified three major areas of injury to Boykin's head: (1) contusion to the forehead; (2) extensive subgaleal hematoma (bleeding between the subcutaneous tissue of the scalp and the surface of the scalp); and (3) intramuscular hematoma to the left temporal muscle. In addition, Dr. Wang identified the following neck-related injuries: (1) petechial hemorrhage of the

bilateral conjunctivae (mucosal surface of the inner plate of the eyelid and top of the eye) and (2) multiple hemorrhagic areas involving the neck muscles, deep soft tissue, root of the tongue, and pharynx. Dr. Wang explained the petechial hemorrhages were greater to the right eye because greater pressure was applied to the right side of the neck. Tr. Vol. III pp. 138, 152. In addition, Dr. Wang explained the hemorrhages to the root of the tongue were caused by "compression to the deep of the neck tissue." *Id.* at 156; *see also id.* at 177-78. Dr. Wang "rule[d] out" ligature strangulation (e.g., with a belt or rope), but he could not rule out manual strangulation. *Id.* at 164. Although Dr. Wang could not identify the "form of strangulation," he said the neck injuries were "compression injuries." *Id.* at 178.

[5] In August 2016, a Lake County grand jury filed an indictment charging Adams with Level 5 felony involuntary manslaughter and Level 6 felony strangulation. The involuntary-manslaughter indictment alleged Adams knowingly or intentionally killed Boykin "while committing or attempting to commit a Level 5 or 6 Felony that inherently poses a risk of serious bodily injury, contrary to I.C. 35-42-1-4(b)(1)." Appellant's App. Vol. II p. 19; *see also* Ind. Code § 35-42-1-4(b)(1) ("A person who kills another human being while committing or attempting to commit . . . a Level 5 or Level 6 felony that inherently poses a risk of serious bodily injury . . . commits involuntary manslaughter, a Level 5 felony."). The strangulation indictment alleged Adams knowingly or intentionally applied pressure to Boykin's throat or neck in a rude, angry, or

insolent manner "that impede[d] the normal breathing or the blood circulation." Appellant's App. Vol. II p. 20.

[6] A jury trial was held over three years later in October 2019. Right before trial started, the State moved to amend the involuntary-manslaughter indictment to remove "knowingly or intentionally" "to more accurately reflect the statutory language" for involuntary manslaughter. *Id.* at 73-75. After a short hearing, the trial court allowed the amendment over Adams's objection.

[7] During closing argument, defense counsel argued that in order for the jury to find Adams guilty of involuntary manslaughter, it had to find he committed Level 6 felony strangulation. Tr. Vol. IV p. 101. The State objected, arguing the jury did not have to find Adams committed Level 6 felony strangulation; rather, it could find he committed another Level 5 or 6 felony. Defense counsel responded the State never identified another Level 5 or 6 felony and therefore "[t]he only felony for this jury's consideration by the choice of the State [wa]s strangulation." *Id.* at 102. The trial court agreed with defense counsel, finding the State was "bootstrapped" into proving Adams committed Level 6 felony strangulation as the predicate offense for involuntary manslaughter. *Id.* at 104.

[8] After deliberations began, the jury sent the following question to the trial court, "If the jury votes not guilty to strangulation, does the law automatically support a not guilty verdict for involuntary manslaughter?" *Id.* at 122. The court consulted with the prosecutor and defense counsel, and they agreed the court

could only tell the jury to re-read the instructions.[1] *Id.* at 124. The court told the parties if the jury came back with a guilty verdict on involuntary manslaughter but a not-guilty verdict on strangulation, it would give them time to brief the issue. Thereafter, the jury found Adams guilty of involuntary manslaughter but not guilty of strangulation.

[9]   The trial court did not immediately enter judgment of conviction for involuntary manslaughter. Adams filed a motion for judgment on the evidence asking the court to enter a judgment of acquittal on involuntary manslaughter on grounds the evidence was insufficient to support a conviction. Appellant's App. Vol. II p. 117. Following a hearing, the trial court denied the motion, stating "[e]ven though the jury found [Adams] not guilty of [strangulation], I — you know, as the State points out, I have no idea why, but there is sufficient evidence[.]" Tr. Vol. IV p. 141. Accordingly, the court entered judgment of conviction for involuntary manslaughter.

[10]  In March 2020, the trial court sentenced Adams to three years, with eighteen months executed in the Department of Correction and eighteen months on community corrections.

[11]  Adams now appeals.

---

[1] In his opening brief, Adams argued the trial court committed fundamental error by not properly answering the jury's question. In its brief, the State argued Adams invited any error by agreeing to the answer given. In his reply brief, Adams withdrew this issue. *See* Appellant's Reply Br. p. 11.

# Discussion and Decision

## I. Amendment to Charging Information

Adams first contends the trial court erred in allowing the State to substantively amend the involuntary-manslaughter indictment right before trial started.[2] We review a trial court's decision on whether to permit an amendment to a charging document for an abuse of discretion. *Howard v. State*, 122 N.E.3d 1007, 1013 (Ind. Ct. App. 2019), *trans. denied*.

Indiana Code section 35-34-1-5(b), which governs substantive amendments to charging documents, provides:

> The indictment or information may be amended in matters of substance and the names of material witnesses may be added, by the prosecuting attorney, upon giving written notice to the defendant at any time:
>
> (1) up to:
>
>> (A) thirty (30) days if the defendant is charged with a felony; or
>>
>> (B) fifteen (15) days if the defendant is charged only with one (1) or more misdemeanors;

---

[2] The State says even if we treat the amendment as one of substance, it wins.

before the omnibus date; or

(2) before the commencement of trial;

if the amendment does not prejudice the substantial rights of the defendant. When the information or indictment is amended, it shall be signed by the prosecuting attorney or a deputy prosecuting attorney.

This provision contemplates that an amendment will be made thirty days before the omnibus date, but it "permits late deviations when they do not prejudice the substantial rights of the defendant." *Howard*, 122 N.E.3d at 1017. A defendant's substantial rights "include a right to sufficient notice and an opportunity to be heard regarding the charge; and, if the amendment does not affect any particular defense or change the positions of either of the parties, it does not violate these rights." *Erkins v. State*, 13 N.E.3d 400, 405 (Ind. 2014) (quotation omitted), *reh'g denied*. "Ultimately, the question is whether the defendant had a reasonable opportunity to prepare for and defend against the charges." *Id.* at 405-06 (quotation omitted).

[14] The parties agree the original indictment erroneously alleged Adams "knowingly or intentionally" killed Boykin because the involuntary-manslaughter statute does not require the killing to be knowing or intentional. Adams argues his substantial rights were prejudiced by the amendment because he planned to take advantage of the State's drafting error and argue to the jury the State failed to prove the killing was knowing or intentional. But this is not what Adams argued at the hearing. *See* Tr. Vol. II pp. 5-6 ("If the Court were to

grant what they're asking and that is to strike the language 'did knowingly or intentionally,' then there would not be a crime charged because mens rea is a requirement."). Regardless, Adams knew, beginning in August 2016, he was being charged with involuntary manslaughter under Indiana Code section 35-42-1-4(b)(1). The amendment did not change the statute under which Adams was being charged. He was still being charged with the same crime, with causing death, and with doing so while committing or attempting to commit a Level 5 or 6 felony that inherently poses a risk of serious bodily injury. The amendment aligned the indictment with the statute—the statute Adams long knew defined his charge—by removing language not contained in the statute. Adams's substantial rights were not prejudiced.

## II. Sufficiency of the Evidence

[15] Adams next contends the evidence is insufficient to support his involuntary-manslaughter conviction because the jury acquitted him of Level 6 felony strangulation, the predicate offense for involuntary manslaughter. The State admits the jury returned a "peculiar combination of verdicts." Appellee's Br. p. 16. However, it claims we can affirm Adams's involuntary-manslaughter conviction on two grounds: (1) the jury found Adams committed a different Level 5 or 6 felony or (2) the jury arrived at inconsistent verdicts on account of lenity. We easily reject the first ground. At trial, the State did not argue, and the jury was not instructed on, any felony offense other than strangulation. As the

trial court found, the State was "bootstrapped" into proving strangulation as the predicate offense for involuntary manslaughter.[3]

[16] As for the second ground, Adams's argument that "an acquittal on a predicate offense necessitates a finding of insufficient evidence on a compound felony count simply misunderstands the nature of the inconsistent verdict problem." *United States v. Powell*, 469 U.S. 57, 68 (1984). Jury verdicts in criminal cases are not subject to appellate review on grounds they are inconsistent, contradictory, or irreconcilable. *Beattie v. State*, 924 N.E.2d 643, 649 (Ind. 2010). This is because a jury may reach inconsistent verdicts for a variety of reasons, including "due to a compromise among disagreeing jurors, or to expeditiously conclude a lengthy deliberation, or to avoid an all-or-nothing verdict," or to exercise the jury's well-established right to exercise lenity. *Id.* at 648-49. A criminal defendant "is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence[.]" *Powell,* 469 U.S. at 67. So long as a conviction is supported by sufficient evidence, a defendant cannot obtain relief on grounds the jury's verdicts are inconsistent. *Beattie*, 924 N.E.2d at 649. Where, as here, the jury returns a guilty verdict on an offense requiring proof of a predicate offense for which the jury acquits the defendant,

---

[3] Adams argues his due-process rights were violated because he did not receive adequate notice that the involuntary-manslaughter charge was based on a felony other than strangulation. However, because we agree with Adams the involuntary-manslaughter charge was based on strangulation, we need not address this argument.

"[t]his review should be independent of the jury's determination that evidence on another count was insufficient." *Powell,* 469 U.S. at 67.

[17] The State argues Adams is not entitled to any relief because the evidence is sufficient to prove he killed Boykin while committing or attempting to commit Level 6 felony strangulation. We agree. The Level 6 felony strangulation count alleged Adams knowingly or intentionally applied pressure to Boykin's throat or neck in a rude, insolent, or angry manner that impeded normal breathing or blood circulation. Robinson, Espinoza, and McGhee testified Adams grabbed Boykin around the "neck" and put him in a "chokehold" or "headlock." Tr. Vol. II p. 205; Tr. Vol. III pp. 21, 31, 50, 62. Boykin had a hard time breathing. Dr. Wang determined Boykin's cause of death was blunt-force trauma to the head complicated by asphyxia due to neck injury. Ex. 15, p. 18; Tr. Vol. III p. 167. Dr. Wang identified the following neck-related injuries: (1) petechial hemorrhages in the eyes and (2) multiple hemorrhagic areas involving the neck muscles, deep soft tissue, root of the tongue, and pharynx. Dr. Wang found there were compression injuries to Boykin's neck and the injuries were greater on the right side because more pressure was applied to that side. This evidence is sufficient to prove Adams committed Level 6 felony strangulation. We therefore affirm Adams's involuntary-manslaughter conviction.[4]

---

[4] Adams also argues the trial court erred in denying his motion for judgment on the evidence. For the reasons just discussed, the trial court properly denied this motion.

[18]     Affirmed.

Bailey, J., and Weissmann, J., concur.